UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
FEUER-GOLDSTEIN, INC.,

                              Plaintiff,                    16-cv-9987 (PKC)

                -against-
                                                           OPINION AND
                                                           ORDER
MICHAEL HILL FRANCHISE PTY. LTD.
and MICHAEL HILL, LLC.,

                              Defendants.
------------------------------------------------------------x

CASTEL, U.S.D.J.

             Plaintiff Feuer-Goldstein, Inc. ("F&G") and Defendants Michael Hill Franchise

Pty. Ltd. and Michael Hill, LLC. (collectively, "Hill") are jewelry manufacturers.  F&G brought

suit against Hill alleging copyright infringement, trademark infringement, unfair competition,

false description, and common law injury to business reputation.[1]  Its claims are based on Hill's

jewelry designs, which F&G argues infringes on its copyrighted "Infinity Heart" design, and on

Hill's alleged unlawful use of F&G's trademark.  Both designs contain a common symbol of a

heart (a valentine shape) and a common symbol for the concept of infinity (a figure eight).

             F&G has withdrawn its claims for trademark infringement and unfair competition,

claims two and three of its Complaint.  (Pl. Br. at 14).  The Court accordingly dismisses those

claims.  With respect to plaintiff's remaining claims for copyright infringement, false

description, and common law injury to business reputation, Hill has moved for summary

judgment.  For the reasons that follow, Hill's motion will be granted.

_____

[1] F&G also alleged a sixth cause of action entitled "Declaratory Judgment as to the Hill Design Patent," but
withdrew this claim without prejudice on May 18, 2017.  (See Doc. 31).

THE UNDISPUTED FACTS

The following facts are undisputed except where otherwise noted. The Court has drawn all reasonable inferences in favor of F&G, as the nonmovant. <u>See</u> <u>Costello v. City of Burlington</u>, 632 F.3d 41, 45 (2d Cir. 2011).

Defendant Michael Hill Franchise Pty. Ltd. is an Australian corporation, while defendant Michael Hill, LLC is an Australian limited liability company. (Def. 56.1 ¶¶ 10-11; Pl. 56.1 Resp. ¶¶ 10-11). Both have a principal place of business in Queensland, Australia. (<u>Id.</u>). Hill entered the United States market in 2008 by acquiring stores in Illinois and Missouri. (Taylor Decl. ¶ 1-2). It opened its first store in New York in 2015, but in May 2018, it closed all of its brick and mortar retail stores. (<u>Id.</u>).

Plaintiff F&G is a New York corporation with a place of business in New York City. (Pl. 56.1 ¶ 9; Def. 56.1 Resp. ¶ 9). F&G's two principal shareholders are Jeffrey Feuer and Dana Goldstein. (Pl. 56.1 ¶ 10; Def. 56.1 Resp. ¶ 10). Feuer has worked in the jewelry industry since 1979. (Feuer Decl. ¶ 4). He first incorporated a design development company in 2001 called Feuer Arts, Inc. (Pl. 56.1 ¶ 9; Def. 56.1 Resp. ¶ 9). From 2003 to 2009, he worked closely with a Goldstein company, Dana Michele, Inc. ("Dana Michele"). (<u>Id.</u>). In 2016, Feuer and Goldstein incorporated F&G and assigned their rights in copyrights and trademarks to F&G. (<u>Id.</u>).

F&G currently has the following U.S. Copyright Registrations: VA 722-644 ("'644"), VA 1955874 ("'874"), and VA 1908793 ("'793"). (Def. 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1). They were published in 1995, 2003, and 2005, respectively. (Compl't, Exs. A, B, D). The '664 registration includes, in total, four pendants and three child charms. (Pl. 56.1 ¶ 17; Def. 56.1 Resp. ¶ 17; Lowe Decl., Ex. L at 226). One of the pendants depicted in the '664 registration is

comprised of a heart frame and a vertical infinity symbol in the center of the heart (the "Infinity Heart" design). (Lowe Decl., Ex. L at 226). The designs in the '874 and '793 registrations are primarily derivatives of the Infinity Heart design, consisting of bracelets, earrings, etc., that incorporate the heart frame and vertical infinity symbol. (See Taddeo Decl., Ex. B). F&G alleges that Hill has infringed on its copyrighted Infinity Heart design as depicted in these copyright registrations. It has submitted evidence of a number of different Hill jewelry products that it alleges are infringing. (See, e.g., Compl't, Ex. J; Taddeo Decl., Ex. O).

*Hill's Heart Design*

Based on the evidence, the only individuals involved in the development of the alleged infringing designs were Galina Hirtzel, Ritesh Mehta, and Hemant Samanta. Hirtzel is a Group Merchandising Executive with Hill. (Def. 56.1 ¶ 22; Pl. 56.1 Resp. ¶ 22). In her declaration, she states that in 2009, she was inspired by jewelry designs incorporating an "Open Heart theme," such as those sold by Kay Jewelers and Tiffany & Co., and identified a need to create a proprietary heart collection for Hill. (Def. 56.1 ¶¶ 23-24; Pl. 56.1 Resp. ¶¶ 23-24). According to Hirtzel, at that time, Hill had a bridal jewelry collection called "EVERMORE," which explored the themes of "love" and "forever," and she believed that a collection based on a heart that represented "forever" was a natural extension of Hill's existing jewelry lines. (Id.). In 2011, Hirtzel declares she approached Hill's contact at Jewelex Australia, Ritesh Mehta, for help creating such a design. (Def. 56.1 ¶ 25-28; Pl. 56.1 Resp. ¶ 25-28).

There are a number of Jewelex entities, including Jewelex New York, Jewelex India, and Jewelex Australia. (Pl. 56.1 ¶ 12; Def. 56.1 Resp. ¶ 12). Mehta is the director of Jewelex Australia, which is located in Sydney, Australia, and has worked there since 2006. (Def. 56.1 ¶¶ 12, 27; Pl. 56.1 Resp. ¶¶ 12, 27). According to Hirtzel, when she approached Mehta with

respect to this project, she and Mehta discussed various concepts, including "forever," "infinite," "heart," and "love." (Def. 56.1 ¶ 28; Pl. 56.1 Resp. ¶ 28). Jewelex Australia relies on designers from Jewelex India and, particularly, Hemant Samanta of Jewelex India is their lead designer for the Australian market.[2] (Def. 56.1 ¶ 29; Pl. 56.1 Resp. ¶ 29). In early 2011, Mehta assigned Samanta the project of creating a heart design for Hill. (Id.).

Samanta has worked in the jewelry industry since 1997. (Def. 56.1 ¶ 30; Pl. 56.1 Resp. ¶ 30). From 1997 to 2001, he was a "Junior Manual Designer" for Jewelex India and was responsible for creating jewelry designs. (Def. 56.1 ¶ 31; Pl. 56.1 Resp. ¶ 31). Since 2001, he has been a "Senior Manager of Design" and is responsible for development of the jewelry markets in Australia and New Zealand on behalf of Jewelex India and supervising the jewelry design department at Jewelex India. (Def. 56.1 ¶ 32; Pl. 56.1 Resp. ¶ 32). While working on the Hill project, Samanta accessed the internet to find ideas, shapes, and designs relating to the concepts of "Forever Love" and "Heart." (Pl. 56.1 ¶ 39; Def. 56.1 Resp. ¶ 39). In doing so, he used the Google search engine, and the Shutterstock website, but not Pinterest. (Id.). Samanta's working papers include numerous sketches that combine heart shapes and infinity symbols. (First Samanta Decl., Annexure HS-1). Samanta prepared an initial submission for Mehta dated May 25, 2011. (Def. 56.1 ¶ 36; Pl. 56.1 Resp. ¶ 36). Mehta showed this submission to Hirtzel. (Id.). Of the six designs in the submission, Hirtzel chose two designs that depicted a vertical infinity symbol in the center of a heart. (Def. 56.1 ¶ 37; Pl. 56.1 Resp. ¶ 37).

[2] F&G has objected to this Court's consideration of Samanta's three declarations as well as Samanta's deposition testimony, arguing that the contents of the declarations are not credible because Samanta testified that he is not fluent in English and the declarations are written in English without a reference to any translator. (Pl. Br. at 2-4, 7). The Court has not relied on the statements in Samanta's declarations to decide defendants' motion. Though the Court has relied on Samanta's working papers, which are attached to Samanta's first declaration, the working papers primarily contain images and sketches, rather than English words, and the Court has only relied on those papers for the images and sketches therein. With respect to Samanta's deposition testimony, there is no reason to exclude this testimony from consideration based on Samanta's contested English fluency because the deposition was conducted through an interpreter.

*F&G's Infinity Heart Design*

According to Feuer, distribution of the Infinity Heart was "sparse" from the date of creation until F&G obtained a sales agreement with Zales in 2014, three years after the creation of the allegedly infringing design. (Feuer Decl. 14; Def. 56.1 ¶ 73; Pl. 56.1 Resp. ¶ 73). Prior to May 2011, F&G's entire distribution of the copyrighted jewelry designs in registrations '664, '874, and '793 were sold as follows: one unit to Borsheims, a retailer in Nebraska in 1995, a "handful" to Fortunoff's in New York between 1995 and 2001, 200-300 to a Greenwich Village design boutique in New York between 2005 and 2009, and 591 units to Gordon's Infinity in Texas. (Def. 56.1 ¶¶ 71-72; Pl. 56.1 Resp. ¶¶ 71-72). In terms of publicity, Feuer has testified that the design was endorsed on the Elvis Duran Radio Show and appeared in Martha Stewart's wedding magazine. (Pl. 56.1 ¶ 27; Def. 56.1 Resp. ¶ 27). F&G also advertised the design in the May, June, and July 1996 issues of Jeweler's Circular Keystone ("JCK") Magazine. (Pl. 56.1 ¶ 23; Def. 56.1 Resp. ¶ 23). An ad for "Jewelex" also appeared in the May 1996 issue of JCK Magazine. (Taddeo Decl., Ex. L).

Feuer has stated that, prior to 2011, the Infinity Heart design was also accessible on the internet through "Pinterest.com," his website "Feuerarts.com," a Dana Michele website "Danamichele.com," and the Trademark Electronic Search System. (Pl. 56.1 ¶ 9; Def. 56.1 Resp. ¶ 9; Def. 56.1 ¶¶ 62, 64; Pl. 56.1 Resp. ¶¶ 62, 64; Feuer Decl. ¶ 11). There is no documentary evidence that the design appeared on Pinterest.com, Feuerarts.com, or Danamichele.com prior to 2011.[3] (Id.). F&G's design also appeared at a JCK Trade Show in Las Vegas in 1995 and 1996. (Def. 56.1 ¶ 71; Pl. 56.1 Resp. ¶ 71; Taddeo Decl., Ex. K). At the

---

[3] In 2003, F&G registered a trademark of the words "Infinity" and "Heart" with a two-dimensional version of the Infinity Heart design in between the words. F&G has presented documentary evidence that this registration appeared online prior to 2011. (Compl't, Ex. C).

1996 show, F&G's design was selected as a finalist in the "Point D'Oro" design contest. (Id.). The design also appeared at a "JA show" in New York between 1995 and 2001, a trunk show in New York in 2008 and 2009, and a "Core Event" show in New York in 2010. (Def. 56.1 ¶¶ 66-68, 71; Pl. 56.1 Resp. ¶ 71).

SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248). On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant." Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014).

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law. Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Id. In raising a triable issue of fact, the non-movant

carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)). A court "may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted).

DISCUSSION

I.     Copyright Infringement

Hill argues that F&G has not presented evidence of actual copying sufficient to permit a reasonable jury to find that Hill infringed F&G's copyrights.[4] To establish a copyright infringement claim, "the plaintiff must demonstrate both (1) ownership of a valid copyright and (2) infringement of the copyright by the defendant." Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 108–09 (2d Cir. 2001) (citation omitted). To establish the infringement prong, the plaintiff must show "(1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's [work].'" Yurman, 262 F.3d at 110 (citation omitted).

Proof of actual copying is required because "[u]nder the Copyright Act, one may market a product identical to a copyrighted work so long as the second comer designed his product independently." Yurman, 262 F.3d at 110; Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991) ("[A] work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying."). "Actual copying may

---

[4] Because the Court resolves Hill's motion on the issue of actual copying it will not reach other arguments presented by Hill.

be established by direct or indirect evidence." <u>Jorgensen v. Epic/Sony Records</u>, 351 F.3d 46, 51 (2d Cir. 2003) (citation omitted). "Because copiers are rarely caught red-handed," actual copying may be proven circumstantially by proof of "access" and "probative similarity." <u>Jorgensen</u>, 351 F.3d at 51, 56; <u>Gaste v. Kaiserman</u>, 863 F.2d 1061, 1066 (2d Cir. 1988) (citation omitted). "[T]o support a claim of access, a plaintiff must offer significant, affirmative and probative evidence." <u>Jorgensen</u>, 351 F.3d at 51 (2d Cir. 2003).

Access exists when "the alleged infringer 'had an opportunity to view or copy plaintiff's work.'" <u>Tisi v. Patrick</u>, 97 F. Supp. 2d 539, 547 (S.D.N.Y. 2000) (citations omitted). "Access must be more than a bare possibility and may not be inferred through speculation or conjecture." <u>Gaste</u>, 863 F.2d at 1066 (citation omitted). Though a plaintiff need not establish "<u>actual</u> access," it must establish "a reasonable possibility of access." <u>Id.</u>; <u>Crown Awards</u>, 326 F. App'x at 579 (citing <u>Jorgensen</u>, 351 F.3d at 55). Whether such a reasonable possibility exists "is obviously a case-specific question." <u>Sylvestre v. Oswald</u>, No. 91-CV-5060 (JSM), 1993 WL 179101, at *3 (S.D.N.Y. May 18, 1993).

Access may be shown by evidence that "the infringed work has been widely disseminated" or that "a particular chain of events exists by which the defendants might have gained access to the work." <u>O'Keefe v. Ogilvy & Mather Worldwide, Inc.</u>, 590 F. Supp. 2d 500, 515 (S.D.N.Y. 2008) (citation omitted). A plaintiff may also establish actual copying without a showing of access "where the works in question are 'so strikingly similar as to preclude the possibility of independent creation.'" <u>Jorgensen</u>, 351 F.3d at 56

Upon reviewing all of the evidence in the light most favorable to F&G, the Court concludes that no reasonable jury could find in F&G's favor on the issue of actual copying. Each individual associated with the creation of the Hill heart design, namely Galina Hirtzel,

Ritesh Mehta, and Hemant Samanta, has denied ever seeing the Infinity Heart design prior to the creation of the Hill heart.  (Hirtzel Decl. ¶ 21-22, Mehta Decl. ¶ 6-7, Samanta Dep. at 7).  In response to these denials, F&G has presented no direct evidence of copying.  Moreover, though the law allows a plaintiff to prove actual copying through indirect evidence, F&G has not come forward with probative evidence that its Infinity Heart design was "widely disseminated," that there was access through a "chain of events," or that the contested designs are so "strikingly similar" that actual copying can be inferred without a showing of access.  Instead, F&G's theory of access appears to rely primarily on discrediting the denials of Hirtzel, Mehta, and Samanta.[5] See Gal v. Viacom Int'l, Inc., 518 F. Supp. 2d 526, 538-39 (S.D.N.Y. 2007) ("Courts have rejected efforts by plaintiffs to establish access in the face of . . . sworn testimony [denying access] unless there is probative evidence to the contrary."); Vantage Point, Inc. v. Parker Bros., 529 F. Supp. 1204, 1213–14 (E.D.N.Y. 1981), aff'd sub nom. Vantage Point, Inc., v. Milton Bradley Co., 697 F.2d 301 (2d Cir. 1982) ("If the most that can be hoped for is the discrediting of defendants' denials at trial no question of material fact is presented.").  As such, the Court concludes that F&G has not presented evidence of actual copying and will grant Hill's motion with respect to F&G's copyright infringement claim.

### i. Wide dissemination

A work is "widely disseminated" for the purpose of inferring access when it has had "considerable commercial success" or is "readily available on the market."  Webb v. Stallone, 910 F. Supp. 2d 681, 686 (S.D.N.Y. 2012).  A work is readily available on the market when it is "widely available for public consumption."  Silberstein v. Fox Entm't Grp., Inc., 424

---

[5] Indeed in the introduction to F&G's brief, it states "[t]here is only one overarching theme before this Court now: Defendants' credibility on all aspects of litigation."  (Pl. Br. at 1).

F. Supp. 2d 616, 627 (S.D.N.Y. 2004), aff'd sub nom. Silberstein v. John Does 1-10, 242 F. App'x 720 (2d Cir. 2007).

F&G's Infinity Heart design was not so widely disseminated prior to 2011 as to permit a reasonable factfinder to infer access. There is some evidence that prior to 2011, F&G's Infinity Heart design appeared on the internet, was a finalist, but did not win, a competition at a 1996 trade show in Las Vegas; appeared in a handful of other trade shows in New York; and had an advertisement in three 1996 issues of JCK Magazine. Feuer has also testified that the design was mentioned on a radio show and in a Martha Stewart magazine on some unknown date. However, these isolated appearances do not amount to the kind of "considerable commercial success" that courts have held warrant an inference of access. See O'Keefe, 590 F. Supp. 2d at 515 (citations omitted) ("[T]he mere fact that [the infringed] work was posted on the internet prior to the creation of defendants' work is insufficient by itself to demonstrate wide dissemination."); see, e.g., ABKCO Music, Inc. v. Harrisongs Music, Ltd., 722 F.2d 988, 997–98 (2d Cir. 1983) (sufficient evidence of access based on wide dissemination where in the year of the alleged access, the infringed song was "Number One" on the *Billboard Charts* in the United States for five weeks, and was one of the "Top Thirty Hits" in England for seven weeks); Iris Arc v. S.S. Sarna, Inc., 621 F. Supp. 916, 918, 921 (E.D.N.Y. 1985) (same where plaintiff marketed its products nationwide, advertised them in an annual catalogue and in trade magazines, exhibited them at frequent trade shows, and had them on permanent display in showrooms in sixteen cities); Novak v. Nat'l Broad. Co., 752 F. Supp. 164, 170 (S.D.N.Y. 1990) (insufficient evidence of wide dissemination where copyrighted skit was broadcast on WOR-TV four times); Silberstein, 424 F. Supp. 2d at 627 (same where cartoon character was featured in a trade magazine).

Moreover, the designs were not "readily available on the market." By Feuer's own admission, distribution of F&G's copyrighted Infinity Heart designs were "sparse" from the date of the design's creation until F&G obtained a sales agreement with Zales in 2014, three years after Samanta created the alleged infringing design. (See Feuer Decl. ¶ 14). Prior to the creation of the Hill heart in 2011, the evidence tends to show that, in total, F&G sold approximately 1,000 units of the copyrighted jewelry to retailers in New York, Texas, and Nebraska. There is no evidence that the distribution of the design reached Australia, where Hill is located and where Hirtzel and Mehta work, or India, where Samanta works.

   ii.   Chain of Events

F&G argues access based on a "chain of events" theory that attempts to link F&G's Infinity Heart design to one of the people involved in the creation of the Hill heart. A "chain of events" theory of access may "rel[y] on a somewhat attenuated chain of events extending over a long period of time and distance." Gaste, 863 F.2d at 1067 ("The lapse of time between the original publication of [the copyrighted song] and the alleged infringement and the distance between the locations of the two events may make copying less likely but not an unreasonable conclusion."). However, a theory based on a "tort[u]ous chain of hypothetical transmittals . . . [is] insufficient to avoid summary judgment on the question of access." Jorgensen, 351 F.3d at 53 (quoting Meta-Film Assocs., Inc. v. MCA, Inc., 586 F. Supp. 1346, 1355 (C.D. Cal. 1984)).

A plaintiff may establish access "through third parties connected to both a plaintiff and a defendant." Gaste, 863 F.2d at 1067 (citation omitted). In such a case, "an inference of access . . . requires 'more than a mere allegation that someone known to the defendant possessed the work in question.'" Tomasini v. Walt Disney Co., 84 F. Supp. 2d 516,

522 (S.D.N.Y. 2000) (citations omitted).  Access through an intermediary may be inferred if the intermediary "has a close relationship with the infringer."  Lessem v. Taylor, 766 F. Supp. 2d 504, 508–09 (S.D.N.Y. 2011) (citations omitted).  Such a relationship exists, for example, if the intermediary "supervises or works in the same department as the infringer or contributes creative ideas to [the infringer]."  Jorgensen, 351 F.3d at 53 (quoting Towler v. Sayles, 76 F.3d 579, 583 (4th Cir. 1996)).  "A plaintiff must generally prove that the creators themselves, and not only an affiliated corporation, had access to the work that was allegedly copied."  Clonus, 457 F. Supp. 2d at 439 (emphasis added).  In this Circuit, "[b]are corporate receipt of [the infringed] work, without any allegation of a nexus between the recipients and the alleged infringers, is insufficient to raise a triable issue of access."  Jorgensen, 351 F.3d at 53.

F&G has not presented evidence that would permit a reasonable jury to infer anyone involved in the creation of Hill's heart design had access to F&G's Infinity Heart design through a chain of events.  F&G proposes three possible routes through which one of the creators of the Hill design gained access to its design.  The first route is based on the presence of F&G's design on the internet, specifically on Feuerarts.com, Danamichele.com, Pinterest.com, and the Trademark Electronic Search System.  The second route is through F&G's advertisements in the May, June, and July 1996 issues of JCK magazine.  Lastly, the third route is through the President of Jewelex New York, who attended a trade show in 1996 where F&G's Infinity Heart design was a finalist in a design competition.  None of these proposed chains of events create more than a "bare possibility" of access.

1. Internet Presence

F&G has not presented evidence sufficient to permit a reasonable jury to infer that any of the creators of the Hill design had access to F&G's design based on its presence on the

internet. Hirtzel, Mehta, and Samanta each deny ever seeing the design prior to 2011. (Hirtzel Decl. ¶ 21-22, Mehta Decl. ¶ 6-7, Samanta Dep. at 7). In response, F&G has not presented evidence that any of these individuals accessed Feuerarts.com, Danamichele.com, or Pinterest.com, or conducted a search on the Trademark Electronic Search System prior to 2011. On this point, F&G relies solely on Feuer's assertion that "I regularly searched Google during the time period in question using search terms like 'infinity', 'heart' and 'forever' to see what the competition was doing . . . I know for a fact that those search terms in a Google search brought up [F&G's design] as well as Feuerarts.com" and Samanta's testimony that he used the internet, particularly Google and Shutterstock, while working on the Hill design. (See Feuer Decl. ¶ 11).

The fact that Samanta used a common search engine and Shutterstock does not create more than a bare possibility that Samanta accessed the websites on which F&G's designs were featured. Aside from Feuer's testimony, there is no evidence that the Infinity Heart design appeared on Feuerarts.com, Danamichele.com, or Pinterest.com prior to 2011. Cf. Nicholls v. Tufenkian Imp./Exp. Ventures, Inc., 367 F. Supp. 2d 514, 521–22 (S.D.N.Y. 2005) (no access where plaintiff's work was displayed on plaintiff's website, it was "unclear when the image was first posted," and the defendant "did not visit the website until after [plaintiff] accused him of infringement"). Even crediting Feuer's testimony that the websites did exist at that time, F&G concedes that "[t]here is no documentary evidence . . . available as to what a Google search in 2011 would have produced to someone searching 'forever love', 'heart' and variations." (Pl. Br. at 7).

Notably, F&G has not presented evidence regarding what any of these websites looked like prior to 2011, whether F&G's designs were prominently featured on these websites such that an internet user would easily stumble across them, how much traffic the websites

received prior to 2011, where geographically this traffic originated from, or whether the websites were accessible from India.  Cf. Design Basics, LLC v. Lexington Homes, Inc., 858 F.3d 1093, 1106 (7th Cir. 2017) (no triable issue on access where copyrighted building plans were on plaintiff's website, plaintiff did not know when the plans were uploaded or whether defendants ever accessed the site, and plaintiff "introduced no evidence concerning [the site's] web traffic, its web search rankings, or the number of times (if any) that the plans at issue have been viewed or downloaded"); Bldg. Graphics, Inc. v. Lennar Corp., 708 F.3d 573, 575 (4th Cir. 2013) (same where two of plaintiff's copyrighted building plans were available on its website, there was no evidence that the plans were "prominently featured" on the website, the defendant surveyed online plans as "part of due diligence" but limited its diligence to its competitors' current offerings, and plaintiff's plans were no longer being built in the region).  It therefore cannot be said that the presence of F&G's designs on these websites paired with Samanta's use of Google creates anything more than a "bare possibility" that Samanta had access to the designs.

## 2. JCK Magazine

Regarding F&G's theory of access based on advertisements in the May, June, and July 1996 issues of JCK Magazine, F&G has presented no evidence of the distribution of that magazine and no evidence that Hill or any Jewelex entity, nevermind Jewelex India (where Mehta works) or Jewelex Australia (where Samanta works), received these issues.  The only evidence that F&G purports links these issues to any of the individuals involved in the creation of the Hill design is an advertisement for "Jewelex" that also appeared in the issues and Samanta's testimony that he "routinely followed trends in the jewelry industry by reading trade publications . . . and attending trade shows."  (Def. 56.1 ¶ 65; Pl. 56.1 Resp. ¶ 65; Pl. Br. at 8).  Even if a Jewelex entity did receive the issues, that receipt amounts to no more than "bare

corporate receipt" because F&G has made no showing of a "nexus" between an individual who received or viewed the issues and one of the creators of the Hill design. See Jorgensen, 351 F.3d at 53. Indeed, it is unlikely that anyone involved in the creation of the Hill design received or viewed the May, June, or July 1996 issues because Samanta did not begin working at Jewelex India until 1997, Mehta did not begin working at Jewelex Australia until 2006, and Hirtzel never worked at a Jewelex entity. Any inference that Hirtzel, Mehta, or Samanta viewed these issues of the JCK Magazine would be based upon sheer speculation and would not permit a reasonable jury to infer access.

### 3. JCK Trade Show

F&G's last theory of access is based on the appearance of F&G's design at the 1995 and 1996 JCK Trade Shows and its selection as a finalist in the Point D'Oro competition at the 1996 show. The only evidence that F&G has presented of any relevant person attending these shows is the testimony of Atul Kothari, the President of Jewelex New York. Kothari testified that he has attended every JCK trade show since approximately 1992, but that he never saw F&G's design prior to his deposition. (Kothari Dep. 54-55, 67-68). Even if Kothari did observe F&G's design, any inference that he passed on what he saw to the creators of the Hill design would necessarily rely on a "tort[u]ous chain of hypothetical transmittals" that does little to rebut Hirtzel, Mehta, and Samanta's assertions that they never saw F&G's design prior to 2011. See Jorgensen, 351 F.3d at 53.

For one, the mere fact that Kothari works at a Jewelex entity does not allow an inference of access on the part of the creators of the Hill heart design. See id. ("[b]are corporate receipt . . . without any allegation of a nexus between the recipients and the alleged infringers, is insufficient to raise a triable issue of access."). This is especially so where Hill has presented

evidence that the Jewelex entities are each located in different parts of the world, separately managed, serve different markets and customers, and use different employees. (Mehta Decl. ¶ 2; Kothari Dep. 41-42); see Silberstein, 424 F. Supp. 2d at 624-26 (no triable issue of access where plaintiff pitched her copyrighted cartoon character to agents at Fox Family Worldwide, but defendant Fox Family Films had a "highly attenuated corporate relationship" with Fox Family Worldwide, the two did not occupy the same building or employ the same people, and Fox Family Worldwide was not involved in the creation of the alleged infringing character).

    F&G attempts to create a nexus between Kothari and Samanta with evidence that Kothari owns 1,000 shares of Jewelex India stock and that Kothari's nephew is the President of Jewelex India, where Samanta works. (Kothari Dep. 8-10). There is no logical basis to infer from these facts that Kothari communicated specific information about a 1995 or 1996 trade show to the President of Jewelex India. In any case, even if the President of Jewelex India received this information from Kothari, access cannot reasonably be inferred because there is no evidence that the President of Jewelex India ever worked with Samanta, supervised him, contributed ideas to him, or otherwise communicated with him. Cf. Novak, 752 F. Supp. at 169-170 (no triable issue of access where plaintiff hand-delivered video-tape of his work to defendant NBC, and the tape made it to the desk of NBC's president); O'Keefe, 590 F. Supp. 2d at 516 (same where plaintiff sent email with a link to a website depicting the infringed work to an employee at the defendant corporation, who did not work in the same department as the creator of the infringing work); Jorgensen, 351 F.3d at 52 (same where plaintiff mailed copies of his song to a producer at the defendant corporation). On a chain of events theory, and taking all evidence of record into account, no reasonable jury could infer access based upon Kothari's

presence at the 1995 and 1996 JCK Trade Shows and Kothari's relationship to Jewelex India and its President.

     iii.  <u>Striking Similarity</u>

     F&G urges that there is a "striking similarity" between its copyrighted design and Hill's design as to permit a reasonable inference of copying.  Actual copying may be proved without a showing of access "where the works in question are so strikingly similar as to preclude the possibility of independent creation."  <u>Jorgensen</u>, 351 F.3d at 56 (citation omitted).  The test for striking similarity is a "stringent" one.  <u>Tisi</u>, 97 F. Supp. 2d at 548 (citation omitted) ("[S]triking similarity exists when two works are so nearly alike that the only reasonable explanation for such a great degree of similarity is that the later . . . was copied from the first.").  "[T]he works 'must be so <u>identical</u> as to preclude any reasonable possibility of independent creation."  <u>Webb</u>, 910 F. Supp. 2d at 687 (citation omitted).  "The mere existence of multiple similarities is insufficient to meet the test."  <u>Gal</u>, 518 F. Supp. 2d at 543.

     "[T]he relevance of a similarity is diminished if the similarity consists of 'stock elements' within a genre or otherwise non-protectable elements."  <u>Webb</u>, 910 F. Supp. 2d at 687 (citation omitted).  In such a case, the arrangement of the non-protectable elements must be "so novel that coincidence could reasonably be ruled out."  <u>Nicholls</u>, 367 F. Supp. 2d at 522 (arrangement of "transected circles in a grid pattern" not strikingly similar).  "[T]he less creative the choice, the stronger the inference that the same choice or group of choices made by another was made independently."  <u>O'Keefe</u>, 590 F. Supp. 2d at 517 (citation omitted).  Where "only so many choices exist[]," it is more likely that similarities are "attributable to independent creation rather than copying."  <u>Procter & Gamble Co. v. Colgate-Palmolive Co.</u>, 199 F.3d 74, 78 (2d Cir.

1999). Further, "evidence of independent creation introduced by defendants can serve to bolster a finding of a lack of striking similarity." <u>Gal</u>, 518 F. Supp. 2d at 547–48.

Here, the copyrighted and accused designs each have a common symbol of a heart and a common symbol for infinity (a figure eight). F&G's Infinity Heart design as depicted in the '664 registration consists of a pendant that is composed of an outline of a heart and a vertical infinity sign located in the center of the heart. (<u>See</u> Lowe Decl., Ex. L at 226). F&G's '874 and '793 registrations contain other pieces of jewelry that incorporate this same design. (<u>See</u> Taddeo Decl., Ex. B). Hill's jewelry pieces also depict a design composed of a heart outline with a vertical infinity sign contained inside. In both designs, the infinity symbol is connected to the top and bottom of the heart and the lines composing the heart frame connect and intersect with the lines composing the infinity symbol such that the heart and infinity symbols are united by one continuous line. In the Hill pieces, the lines of the heart and the infinity symbol intersect in a different manner than in the F&G designs.

Hill's designs are undoubtedly similar to the designs in F&G's copyright registrations. Indeed one design (Taddeo Decl., Ex. O) is almost identical to the Infinity Heart design in F&G's '664 registration. To infer actual copying based on the stringent "striking similarity" test, however, the similarities between the contested works must be "so <u>identical</u>" as to "preclude any reasonable possibility of independent creation." <u>See</u> <u>Webb</u>, 910 F. Supp. 2d at 687. The similarities here do not satisfy that high standard.

First, the parties do not dispute that F&G's designs are composed of two elements that are common in the jewelry market: a heart shape and an infinity symbol, which together imply the common idea of love lasting forever. (Def. 56.1 ¶¶ 82-83; Pl. 56.1 Resp. ¶¶ 82-83). As such, the protectability of F&G's design is limited to the way that F&G has arranged these

elements. Samanta's specific arrangement of these two common elements—generally, the use of a vertical infinity symbol in the center of a heart—is not so novel as to permit an inference of copying. No reasonable jury could find a level of "striking similarity" sufficient to permit an inference of copying. The similarities are consistent with independent creation. Indeed, there are only so many ways that a designer can combine two discrete elements. Samanta's working papers, which contain sketches of various jewelry designs, shed light on the possible combinations of a heart shape and an infinity symbol in a piece of jewelry. Those papers also constitute some additional evidence of independent creation. See Gal, 518 F. Supp. 2d at 547–48 (concluding that "notebook with approximately 25 pages of notes on the [plaintiff's] Novel provides some evidence of independent creation," which "buttresses defendants' argument that there is no triable issue of fact on striking similarity"). The similarities in this case fall far short of those that other courts have held to be strikingly similar. See, e.g., Lipton v. Nature Co., 71 F.3d 464, 471–72 (2d Cir. 1995) (scarf design strikingly similar to plaintiff's book where "[o]ut of the 77 different animal terms of venery that appear in [the book], 72 of them are listed on the scarf, . . . the scarf includes only one animal term . . . that does not appear in [the book,] [and] the scarf contains at least six translation errors that existed in [the book's] first two editions").

Taking all of F&G's evidence on all theories as a whole, no reasonable jury could infer access either through "wide dissemination" or a "chain of events" theory or copying based on "striking similarity." The Court will grant summary judgment dismissing the copyright infringement claim.

II.     False Description and Injury to Business Reputation

F&G alleges claims of false description and common law injury to business reputation. Hill has moved for summary judgment on these claims, arguing that they "rise or

fall" with the trademark and unfair competition claims.  (Def. Br. at 2).  As discussed, F&G explicitly withdrew its claims for trademark infringement and unfair competition in response to F&G's motion for summary judgment.  (Pl. Br. at 10).  However, nowhere in its brief does F&G reference the claims of false description and common law injury to business reputation by name. Specifically, F&G states only that "Plaintiff will voluntarily dismiss its trademark and unfair competition claims."  (Pl. Br. At 10).  As a reason for the voluntary dismissal, it states that it accepts Hill's representation that "use of Plaintiff's design marks ceased in 2016" and that "damages for trademark infringement are likely to be <u>de minimis</u> and an injunction against a use that no longer exists would be futile."  (<u>Id.</u>).

   F&G's false description claim is based on "[Hill's] wrongful uses of Plaintiff's marks" and alleges that Hill's use of the marks "comprise[] a false description or representation of [Hill's] business or products under [Section 43(a) of the Lanham Act]."  (Compl't ¶¶ 51-52). F&G's common law injury to business reputation claim is based on "[Hill's] wrongful use of Plaintiff's trademark," which it alleges "creates a likelihood of injury to Plaintiff's business." (Compl't ¶ 54).  In its response to Hill's Local 56.1 Statement of Material Facts, F&G concedes that Hill's alleged wrongful use of its mark did not "create a likelihood of confusion," that "[F&G] has no evidence of injury caused by [Hill's] use of the [marks]," that "[F&G] has no evidence of noteworthy reputation associated with its [trademark]," and that "[Hill's] jewelry are not of inferior quality."  (Def. 56.1 ¶¶ 114-15, 120-22; Pl. 56.1 Resp. ¶¶ 114-15, 120-22).

   A court "may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed."  <u>Felix v. City of New York</u>, 344 F. Supp. 3d 644, 654 (S.D.N.Y. 2018) (citing  <u>Arma v. Buyseasons, Inc.</u>, 591 F. Supp. 2d 637, 643 (S.D.N.Y. 2008)); <u>see</u> <u>also</u>, <u>Jackson v. Fed. Exp.</u>, 766 F.3d 189, 196 (2d Cir. 2014)

("Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended.").

Here, the circumstances indicate that F&G intended to abandon its false description and injury to business reputation claims. For one, F&G has not responded to Hill's argument that the claims be dismissed and has not contested facts relating to these claims in its response to Hill's Local 56.1 Statement. Moreover, these claims are also based on Hill's alleged wrongful use of F&G's trademark and F&G has already voluntarily dismissed "trademark and unfair competition claims." (Pl. Br. at 10). Based on these circumstances, the Court concludes that F&G intended to abandon the false description and common law injury to business reputation claims and accordingly dismisses those claims.

CONCLUSION

For the aforementioned reasons, defendants' motion for summary judgment dismissing plaintiff's claims in their entirety is GRANTED. Plaintiff's cross-motion to strike and defendant's motion for oral argument are DENIED as moot. The Clerk is directed to terminate the motions (Docs. 83, 98, 104), enter final judgment in favor of defendants, and close the case.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
      March 27, 2019